UNITED STATES, Appellee

v.

CARMEL A. CRUNK, Private E–2, U. S. Army, Appellant

4 USCMA 290, 15 CMR 290

No. 3653

Decided May 14, 1954

MAJ Edwin Doran, U. S. Army, and 1ST LT Justin L. Vigdor, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Donald M. Sukloff, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The petitioner was tried and convicted by a general court-martial convened at Frankfurt-am-Main, Germany, for housebreaking and larceny in violation of Articles 130 and 121, Uniform Code of Military Justice, respectively, 50 USC §§ 724 and 715. The sentence of dishonorable discharge, total forfeitures, and confinement at hard labor for one year, as imposed by the court, was approved by the convening authority, and affirmed by the board of review. Of the sundry issues originally raised by petitioner on petition for review, two were considered worthy of further scrutiny. They were:

"1. Whether the entry by the accused into the tent of another without authority constituted housebreaking.

"2. Whether the participation by the law officer in the preparation of the review of the staff judge advocate was prejudicial."

Summarizing the facts which give rise to the first of these two assignments of error, we find that during the early morning hours of  December 14, 1952, at Giessen, Germany, Private Carroll Gordon passed a tent then occupied by men belonging to his mortar company. His curiosity was aroused by the fact that the tent light was on. He approached the tent, peered through an opening at the back, and observed the accused, a stranger, searching through the pockets of fatigue pants which obviously belonged to an occupant of the tent then asleep. According to Gordon, he entered the tent and asked the accused what the latter was doing. In reply, the accused stated that he was looking for "Hazard," a former member of the company who, it subsequently developed, had departed for the United States two or three weeks before. Gordon in turn informed the accused that Hazard could not be found in the pockets of a fatigue suit. Continuing this colloquy, accused replied with words to the effect that he was caught and he thereupon offered to return the money he had taken. There is a dispute in the evidence as to whether

**291**

this confession was made before or after the accused was administered a beating, but, in either event, the accused then placed 20 Marks in coin, $7.00 or $8.00 in scrip, and three American pennies on one of the beds. Private Cooley, an occupant of the tent, who had been awakened by the incident, immediately examined his fatigues and 20 Marks in coin and three American pennies were found missing. Following the abbreviated scuffle, the accused offered to give Gordon a watch if his captor would say nothing to the military authorities about his crime. His entreaty was to no avail.

Accused related his version of the intrusion in a somewhat different light. He accounted for his presence in the living quarters of others by asserting that he did not know in which tent his friend, Hazard, lived. Being uncertain, he entered the tent, which was lighted, for the sole purpose of checking on the name plates hung on the tent pole. On being informed by Gordon that his buddy had been returned to the United States, he intended to leave the tent, but Gordon interfered with his departure. Moreover, he contended Gordon accused him of being a thief, struck him several times, and, to escape punishment, he relinquished money which was, in fact, his own.

On cross-examination, accused testified that he had first met Hazard in 1951 and had served in the same squad with him; that his subsequent transfer to a different company did not terminate their friendship, for they still met two or three times a week; that, although he knew his friend was going to leave soon, he did not know the exact date of the departure; and that, on the night in question, he was unaware of the fact that his friend was no longer in the area.

Upon these facts rests the solution of the first issue. It poses no problem because the principles involved have been treated in two opinions since we granted review on this appeal. In United States v. Williams, 4 USCMA 241, 15 CMR 241, we held that the offense of housebreaking is comprised of both an "unlawful entry" and a "contempora-

neous criminal intent," and that the legality of an entry depends "on authorization, negative or positive, express or implied." In supplementation, we announced in United States v. Love, 4 USCMA 260, 15 CMR 260, that a tent was a "building or structure" within the meaning of the terms found in Article 130, Uniform Code of Military Justice, supra, and, therefore, was capable of being the subject of an unlawful entry.

Measured by the standards announced in those cases, we must conclude that the facts of the instant case support the alleged illegal entry. Standing uncontradicted are those facts which show that the accused was unknown to, and uninvited by, the occupants of the tent. The self-asserted purpose of his presence in this tent is far from convincing. He was not in the tent by solicitation from anyone, and it is a bit extraordinary to visit another during early morning sleeping hours when the whereabouts of the person one is desirous of fraternizing with are unknown. The professed bond of friendship which was used to justify his presence is weakened by his admitted ignorance of the friend's past and present residence. Furthermore, his acts while in the tent hardly comport with his claim that he was seeking to find his friend by inspecting the names on the name plates. The facts as amplified by our comments should leave little doubt about the sufficiency of the evidence to establish both an unlawful entry and an intent to steal. Accordingly, the first issue is resolved against the accused.

The second issue must be determined in favor of the accused. The record reveals the fact that the Staff Judge Advocate's review, which was submitted to the reviewing authority, is signed just below its terminal portion by both a civilian attorney and the law officer. Following their signatures is found the remark, "I concur in the Opinion and Recommendation," signed "G. E. Crane, Lt Col JAGC, Div Staff Judge Advocate." It is the law officer's participation in this Staff Judge Advocate's review which gives rise to the second assigned error in this case.

The necessity for this review, and of all general court-martial reviews, is occasioned by Article 61, Uniform Code of Military Justice, 50 USC § 648, which provides:

"The convening authority shall refer the record of every general court-martial to his staff judge advocate or legal officer, who shall submit his written opinion thereon to the convening authority. If the final action of the court has resulted in an acquittal of all charges and specifications, the opinion shall be limited to questions of jurisdiction and shall be forwarded with the record to The Judge Advocate General of the armed force of which the accused is a member."

The selection of a reviewer by a convening authority is not unfettered for Article 6(c), Uniform Code of Military Justice, 50 USC § 556, further complemented by paragraph 85a, Manual for Courts-Martial, United States, 1951, provides:

"No person who has acted as member, law officer, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in any case shall subsequently act as a staff judge advocate or legal officer to any reviewing authority upon the same case."

Government appellate counsel press on us the argument that there was no violation of the foregoing provisions for, in truth and in fact, the Staff Judge Advocate acted in his normal assignment, reviewed the record, and submitted his independent judgment on the law and the facts. The argument fails primarily because the record shows only that he concurred in the opinion and recommendations. Those were the handicraft of a disqualified person, and a mere concurrence by the Staff Judge Advocate would not remove the vice which Congress sought to eliminate when it provided for a review by an impartial examiner. In a somewhat similar case of United States v. Coulter, 3 USCMA 657, 14 CMR 75, we expressed our views of Article 6(c) in the following language:

"The obvious purpose of the lawmakers in prohibiting trial counsel from subsequently acting as the Staff Judge Advocate on the review of the same case was to assure the accused a thoroughly fair and impartial review."

As therein stated, the prohibitions in this Article of the Code are made to insure impartiality. Senate Report 486, page 6, and House Report 491, page 12, on HR 4080, 81st Congress, 1st Session. We emphasized the importance of this type of review in United States v. Gordon, 1 USCMA 255, 2CMR 161, by stating:

". . . the right to an impartial review is an important right which must be recognized in the military judicial system and an accused is entitled to have the record reviewed and the limits of his sentence fixed by one who is free from any connection with the controversy."

Applying the above observations to the case at bar, it is perfectly apparent that any law officer, who thereafter reviews the record for a convening authority, violates Article 6(c) in so doing. And the law officer in this case falls in that category even though there was another senior officer who occupied the assignment as staff judge advocate. The report is all-inclusive. It touches on the facts for sufficiency, the law for errors, and the sentence for appropriateness. It certainly is not going beyond the bounds of fair assumptions to suppose that the detailed inspection of the record was prepared by the man who controlled the litigation at the trial level. He must have been the assistant staff judge advocate of the Division and his immediate superior, the Staff Judge Advocate, would be inclined to give weight to his views of the law and the facts. The latter's formal concurrence in the opinion and recommendation indicates as much. We could, of course, speculate that the Staff Judge Advocate had made an independent review of the record, but there are no facts furnished us for such conjecture. To escape the lack of facts, it is contended that the Staff Judge Advocate is presumed to have performed his obligations; but it is

**293**

not uncommon nor improper for the assistant to execute those duties, and the base for such a presumption falls. The probabilities in this instance are that the Staff Judge Advocate merely read the review as there would be no good reasons to have two assistants perform the labors of reading the record, researching the law, interviewing the accused, and drawing the conclusions, if the senior officer was to cover the same ground. Aside from that, the Article is intended to prevent a participant at the trial level from influencing the action of the convening authority, and it would be platitudinous reasoning for us to reach a conclusion that the disqualified officer did not assist in inducing the approval of the findings and sentence.

Not only was the procedure followed in this case contrary to the express command of Congress, but it was prejudicial to the accused. He was entitled to have his record reviewed by a person who had no interest in glossing over the presence of any error in the record. The reviewing officer, as law officer, was required to rule on many questions of law during the trial of the case and some of those involved questions of importance. There was an issue on the voluntariness of the confession which he had to determine as an interlocutory question; there were many rulings he was required to make on the admissibility of evidence; a motion for a finding of not guilty based on legal grounds was posed; and numerous instructions were given by him. Certain-

ly, he was interested in having all of his rulings affirmed by the reviewing authorities. To permit him to examine and verify his own rulings is no different than permitting a judge to review his own decisions on appeal. That is some distance removed from a fair and impartial review. Without casting any reflections on the officer in this case, we believe human behavior is such that once he arrived at a conclusion during the course of the trial, he would be disinclined to reverse himself on a subsequent review. Even if we were to concede he might possibly do so, the accused is entitled as a matter of right to have his appeal free from that contingency. Moreover, without attempting to pass on the correctness of the rulings and instructions, we nevertheless mention that at least one important ruling is questionable. The important matter, however, is that every issue considered on review was weighed by an individual with a preconceived opinion. We believe that sufficient to materially prejudice a substantial right accorded to the accused. In addition, the same officer personally interviewed the accused for clemency purposes and made a recommendation touching on that subject. In United States v. Coulter, supra, the majority of the Court concluded that that violation alone required a reversal. This is a more serious breach, and the same action must be taken.

The decision of the board of review is reversed and a rehearing is granted.

Chief Judge QUINN and Judge BROSMAN concur.